**NESGLO, INC., et al., Plaintiffs,**

v.

**The CHASE MANHATTAN BANK, N.A. et al., Defendants.**

**Civil. No. 79–1674.**

United States District Court,
D. Puerto Rico.

Dec. 2, 1980.

Edelmiro Salas García, Hato Rey, P. R., for plaintiffs.

Leopoldo J. Cabassa, Sauri, Fiddler, González & Rodríguez, San Juan, P. R., for defendants.

## OPINION AND ORDER

GIERBOLINI–ORTIZ, District Judge.

I

This action was commenced in July, 1979 by plaintiffs Nesglo, Inc., Néstor Cruz and Gloria Díaz de Cruz against defendants The Chase Manhattan Bank, N.A., Stanley Zych and Enrique Fernández.[1] On September 4, 1979 plaintiffs filed a Complaint amended as of right pursuant to Federal Rules of Civil Procedure 15(a) (hereinafter the Complaint).[2] On September 18, 1979, defendants moved the Court to dismiss the Complaint for lack of jurisdiction and venue, contending that it failed to state cognizable claims within federal judicial reach and that in any event plaintiffs had chosen the Courts of Puerto Rico to assert therein as defendants-counterclaimants similar rights against defendant Chase (plaintiff in a breach of contract action in the local courts).

Simultaneously with this Motion to Dismiss, and, in the alternative, defendants requested this Court to stay proceedings including discovery, until termination of the pending action between the same parties in the Superior Court of Puerto Rico, San Juan Part.

Thereafter, plaintiffs engaged in some discovery, and after certain rulings by the Magistrate (which were never challenged), formally opposed defendants' Motion to Dismiss. Defendants filed a Reply to Plaintiffs' Opposition.

The action was then assigned to a Judge sitting by designation for pretrial and trial. After a series of status conferences, settlement possibilities between the parties were explored by the Court but no concrete results achieved. Defendants' Motion to Dismiss and/or Stay was then taken under advisement. Meanwhile, the parties were encouraged to pursue their discovery on the similar pending state court action.

From a series of motions and countermotions filed by the parties in this Court, it appears that the case in the Superior Court has advanced as to decision of certain pretrial motions and discovery.[3]

II

In order to properly rule on defendants' Motion to Dismiss an examination of the Complaint is in order.

---

1. We shall use the terms "plaintiffs" and "defendants" as including both the corporate and natural persons appearing as such in the caption of the Complaint. Whenever specific reference is necessary to the corporate or individual plaintiffs we shall designate each respectively as "Nesglo", "Cruz" and "Díaz", and when such reference becomes necessary with respect to the corporate or individual defendants, we shall designate each, respectively, as "Chase", "Zych" and "Fernández".

2. The only difference between the original and amended complaint lies in the formal jurisdictional first paragraph of each. In the Amended Complaint, 11 U.S.C. Section 46 appears as an additional ground for this Court's subject matter jurisdiction. In view of plaintiff's representation to the Court, that Nesglo's Bankruptcy Petition was dismissed, *Plaintiffs' Motion in Opposition to Motion to Dismiss and or Stay*, p. 3, we need not address ourselves to defendants'

challenge of this Court's jurisdiction under 11 U.S.C. Section 46. The Amended Complaint and the original Complaint now being identical we shall designate both documents as "the Complaint".

3. Among the issues that have been submitted to local court determination is whether the parties to this action reached a final and binding settlement back in January, 1980, which would displace all of plaintiffs' claims in this action and render moot our disposition of defendants' Motion to Dismiss. Thus far, however, our attention has not been called to any local court order passing upon this issue and hence we proceed to adjudicate the jurisdictional questions raised without prejudice to vacating or modifying our order should the local court find that a settlement actually exists and enter judgment accordingly.

After formally invoking the jurisdiction of this Court in paragraph 1,[4] plaintiffs essentially allege that defendant Chase is a national banking association, Zych and Fernández are its employees or agents and Nesglo is a Puerto Rican Corporation with Cruz and Díaz as its sole stockholders. The Complaint further alleges that in 1972 Chase and Nesglo entered into a commercial relationship whereby Chase agreed to and did extend credit to Nesglo of up to two million dollars; that as a condition for the extension of said credit Chase required Nesglo to refrain from doing business with any other bank competitor of Chase and that Nesglo handle all of its business and deposit accounts with said bank. It further alleges that Chase conditioned the foregoing extensions of credit with additional burdensome impositions, not described but nevertheless characterized as part of a supposed conspiracy having as its goal Chase's unjust enrichment; that as a part of this scheme Chase progressively burdened this loan relationship by prohibiting Nesglo from opening checking or deposit accounts or the drawing of checks on deposits made in other banks; that Chase announced to customers of Nesglo that no further credit would be granted to benefit other competitors of Nesglo doing business with Chase; that all these acts of Chase caused Nesglo to cease operations through an illegal attachment of its goods.

The Complaint then goes on to state and identify the previous transactions involving extension of credit as part of certain financing agreement and as subsumed and continued pursuant to a "Factor's Lien Contract and Assignment of Accounts Receivable" dated February 22, 1977, alleging that the last two contracts are the result of the

joint commercial loan relationship between Chase and Nesglo.

Nesglo further avers that Chase exacted from it usurious interest or interest in excess of Commonwealth legal limitations, but does not specify under what grounds these usury limitations would be applicable to its relationship with Chase, especially when said relationship is of a corporate business loan character.

The Complaint then alleges that Chase and its officers Zych and Fernández pursued an attachment of Nesglo's goods through local Court procedure in satisfaction of a putative fraudulently induced default in loan repayments. It further avers that such attachment deprived plaintiffs of their civil rights and the same is actionable under the general federal question statute 28 U.S.C. Section 1331. As part of these pleadings, plaintiffs further aver generally that Chase breached certain unspecified contractual relationships with Nesglo.

Finally, plaintiffs pray for treble damages and a declaration that their contractual relationship with Chase is null and void.

We shall first deal with the jurisdictional problems arising in connection with the civil rights claims made in the Complaint and then proceed to determine whether there is any other statutory basis for this Court to entertain the claims made by plaintiffs against the corporate and individual defendants.

### III

A—*The Civil Rights Claims*:

As previously pointed out, plaintiffs urge as jurisdictional grounds in support of their

---

**4.** Plaintiffs single out certain Judicial Code Sections and other congressional enactments which purportedly confer subject matter jurisdiction on this Court to entertain the claims made in subsequent paragraphs of the Amended Complaint. In essence, they call our attention to 28 U.S.C. Sections 1331 (General Federal Question), 1343 (Special Federal Question for Redress of Civil Rights Violations), 2201 and 2202 (Establishing Declaratory Actions in Federal Courts); 42 U.S.C. Sections 1981 (Violation of Certain Equal Protection Rights), 1983

(Violation of Constitutional Civil Rights in General); 12 U.S.C. Sections 85, 86 (Relating to Interest Chargeable by National Banks), 1972, 1973 and 1976 (sic) (Relating to Summary Jurisdiction by the Bankruptcy Court under the Old Bankruptcy Law, no longer at issue in this action). The only statement, beyond invocation of the aforementioned sections, included in paragraph 1 refers to defendants' allegedly prejudicial confiscatory actions in violation of plaintiffs' civil rights.

civil rights claims, 42 U.S.C. Sections 1981, 1983 *et seq.* and 28 U.S.C. Sections 1331 and 1343.[5] The gravamen of these claims is that defendants acted under "color of state law" when the state court ordered the attachment of Nesglo's inventory in the local breach of contract suit initiated by Chase, upon default in payments by Nesglo of certain Factor's Lien promissory note held by Chase. However, it is clearly averred in the Complaint that defendant Chase is a national banking association authorized to do business in Puerto Rico and defendants Zych and Fernández are employees and/or agents of Chase. There are no statements in the Complaint from which it could be inferred that Chase, Zych and Fernández are connected with or affiliated with the Government of the Commonwealth of Puerto Rico.

■ At the outset we can easily dispose of plaintiffs' claims based on 42 U.S.C. Section 1981.[6] A mere reading of the statutory language set forth in the margin reveals the inappositeness of this federal civil rights enactment to the claims advanced in the Complaint.

Its wording as well as that of Section 1982 [7] (to the extent that the "et seq." may include Section 1982) prohibits racial dis-

crimination and assures the same equality of treatment to non-white citizens as is enjoyed by white citizens within the jurisdiction of the United States. The purpose of both Sections 1981 and 1982 has been said to provide for equality of rights as between persons of different races, as well as "to bar all racial discrimination, private, as well as public in the sale and rental of property ..." *Jones v. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968); *Hague v. C. I. O.*, 307 U.S. 496, 509, 59 S.Ct. 954, 961, 83 L.Ed. 1423 (1939); *Virginia v. Rives*, 100 U.S. 313, 318, 25 L.Ed. 667 (1880); *Agnew v. Compton*, 239 F.2d 226, 230 (9th Cir.); cert. denied, 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1956); overruled on other grounds; *Cohen v. Norris*, 300 F.2d 24 (9th Cir.), disagreed with other grounds, *Herschel v. Dyra*, 365 F.2d 17 (7th Cir.), cert. denied, 385 U.S. 973, 87 S.Ct. 513, 17 L.Ed.2d 436 (1966). Although Section 1981 was designed to prohibit all racial discrimination, whether or not under color of law, there are absolutely no factual predicates in the Complaint, upon which any action could arise on behalf of plaintiffs under Sections 1981 or 1982. Accordingly, plaintiffs' formal allegation in paragraph 1 of the Complaint, wherein Section 1981 *et seq.*[8] appears, is inadequate and this Court

---

5. See note 4, supra; there being sufficient allegations in the Complaint concerning jurisdictional amount, there is no practical necessity to distinguish between 28 U.S.C. Section 1331 and 28 U.S.C. Section 1343 as jurisdictional counterparts of 42 U.S.C. §§ 1981 and 1983. See, *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 606, 99 S.Ct. 1905, 1910, 60 L.Ed.2d 508 (1979).

6. 42 U.S.C. Section 1981 provides as follows: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

7. 42 U.S. Section 1982 provides as follows: "All citizens of the United States shall have the same right in every State and Territory as is enjoyed by white citizens thereof to inher-

it, purchase, lease, sell, hold and convey real and personal property".

8. To the extent that "*et seq.*" is intended by plaintiffs to cover sections 1984 and 1985, as possible grounds for stating a claim thereunder, their contention may be summarily rejected. Section 1984 providing that the Supreme Court may hear an appeal in certain civil right cases is obviously irrelevant to any action in the district court. *O'Dea v. Mass. Bd. of Education*, 393 F.Supp. 202 (D.C.Mass.) aff'd 527 F.2d 642 (1st Cir. 1975).

Sections 1985 and 1986, of course, fare no better. Aside from the fact that its conspiracy claims are glaringly conclusory, the Complaint is totally devoid of any allegations pointing to class-based animus, a prerequisite for a Section 1985 action and hence one under Section 1986. *Glaros v. Perse*, 628 F.2d 679 at 685 n.12 (1st Cir., 1980 and cases *cited*).

The rest of the sections under Title 42, United States Code, are not even worth mentioning since they have no possible relevance to the claims asserted.

lacks jurisdiction under 28 U.S.C. Section 1343 as it may implement Sections 1981 and 1982's substantive provisions. *Hagans v. Lavine*, 415 U.S. 528, 536, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974) and cases cited.

■ With respect to 42 U.S. Section 1983[9] it is axiomatic that a civil rights claim thereunder, may only be prosecuted against a state officer or, by way of exception to the general rule that private parties are not covered by the statute, against private entities suffused and clothed with the trappings of official "state action" with respect to the particular acts or omissions upon which the deprivation claims rest. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *U. S. v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Rodríguez v. Conagra, Inc.*, 387 F.Supp. 951, aff'd, 527 F.2d 540 (1st Cir. 1975); *Moro v. Telemundo, Inc.*, 387 F.Supp. 920 (D.C.P.R.1974); *Montañez v. Colegio de Técnicos de Refrigeración y Aire Acondicionado*, 343 F.Supp. 890 (D.P.R.1972); *El Mundo, Inc. v. Puerto Rico Newspaper Guild*, 346 F.Supp. 106 (D.C.P.R.1972).

It has also been generally held that creditors availing themselves of local statutes to collect their credit and generally foreclose liens securing such credits do not act under "color of law" or become impressed with "state action" so as to become civilly liable under 42 U.S.C. Section 1983 because they may be private litigants or attorneys in state courts.[10] *Torres v. First State Bank of Sierra County*, 588 F.2d 1322, 1325–1327 (10th Cir. 1978) and *cases cited*; *Taylor v. Nichols*, 558 F.2d 561, 564–565 (10th Cir. 1977); *Wartman v. Branch 7, Civil Div., County Court*, 510 F.2d 130 (7th Cir. 1975); *Stevens v. Frick*, 372 F.2d 378, 381 (2nd Cir.) cert. denied 387 U.S. 920, 87 S.Ct. 2034, 18 L.Ed.2d 973 (1967); *Lefkowitz v. Liden*, 443 F.Supp. 352, 358 (D.C.Mass.1978) and cases cited. Even self-held acts by creditors authorized by state law are not covered by Section 1983, *Davis v. Richmond*, 512 F.2d 201, 202 (1st Cir. 1975) and, the First Circuit Court of Appeals has explicitly held that neither the monitoring or supervision of a national bank by state authorities or the federal government can give rise to a cognizable claim under the statute. *Fletcher v. Rhode Island Hospital Trust Nat. Bank*, 496 F.2d 927 (1st Cir.) cert. denied, 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1975).

■ Plaintiff's Complaint merely states that Chase, as a private banking entity, and Zych and Fernández, as its officers invoked local Court process which resulted in an attachment of Nesglo's goods in satisfaction of a defaulted note and/or previous unpaid extensions of credit granted by Chase. In these circumstances, we fail to perceive how, when, where or why should Chase's and/or Zych's and Fernández, as its officers invoked local Court process which resulted in an attachment of Nesglo's goods in satisfaction of a defaulted note and/or previous

---

**9.** 42 U.S.C. Section 1983 provides as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**10.** This is the general rule followed by most circuits. The First Circuit Court of Appeals, however, has carved out an exception to accomodate instances of conspiracies with state officers, even if the latter are not joined in the suit. *Kermit Const. Corp. v. Banco Crédito y Ahorro Ponceño*, 547 F.2d 1, 3 (1st Cir. 1976).

Nevertheless, this does not mean that plaintiffs are free to allege conclusory statements of conspiracy offering limited insight into the specific nature of the alleged concerted action between defendants and any state officer which could convert private action into state action. *Glaros v. Perse*, supra, at 684–685. It therefore, "fits like a glove" within the general rule set forth above. Indeed, even if state officers or state action were involved, the Complaint is devoid of the minimal factual support that could lead this Court to conclude that plaintiffs have been deprived of any rights secured by the "constitution and laws" within the meaning of that phrase in Section 1983. *Glaros, supra*, at 684. Cf. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

unpaid extensions of credit granted by Chase. In these circumstances we fail to perceive how, when, where or why Chase and/or Zych's and Fernández' actions could fit within the reach of Section 1983. *Berríos v. Inter. Am. University*, 535 F.2d 1330, 1331 (1st Cir. 1976).

Additionally, plaintiffs fail to state in what way defendant's utilization of state court process may have deprived them of any constitutionally protected rights.[11] The allegations of the Complaint are obviously conclusory and insufficient at law to sustain an action for deprivation of civil rights under 42 U.S.C. Section 1983. *Glaros v. Perse*, at 684 (1st Cir., 1980); *Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir. 1977); *Slotnick v. Staviskey*, 560 F.2d 31 (1st Cir. 1977), cert. denied, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *Ludwin v. City of Cambridge*, 592 F.2d 606, 610 (1st Cir. 1979) and *cases cited; Hurney v. Carver*, 602 F.2d 993, 995 (1st Cir. 1979); *Pamel Corporation v. The Puerto Rico Highway Authority*, 621 F.2d 33 at 36 (1st Cir., 1980).

**B—*The Other Constitutional Claims Allegedly Cognizable Under 28 U.S.C. Section 1331*:**

■ Plaintiffs generally state that they have been deprived of due process and equal protection rights secured by the 4th, 5th and 14th Amendments to the Constitution of the United States. They also advance the proposition that this Court has jurisdiction to redress their putative deprivations under 28 U.S.C. Section 1331(a) which provides in the pertinent part that federal "district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 . . . and arises under the Constitution . . . of the United States. . ."

The operative facts allegedly giving rise to a claim for relief under the above constitutional provisions is found in paragraph 25 of the Amended Complaint, which states as follows:

"25. That the closing of the complete establishment and surrounding area where Nesglo operated and the ensuing stoppage of all of its business operations constituted an illegal taking of property under color of law in gross violation of the constitutional guarantees to due process and equal protection of the law as set forth under the Constitution of the United States, as amended, and as such are actionable under Section 1331, Title 28 USC and *Davis v. Passman*, [442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846] 5 June 1979."

The difficulty with this allegation is that no federal or state officers are involved either directly or indirectly in this action. In this sense we echo what the First Circuit Court of Appeals has stated in connection with a suit against a national banking association for an alleged deprivation of a federal constitutional right " . . . there is no cause of action against private parties acting under color of federal law or custom". *Fletcher v. Rhode Island Hospital Trust National Bank, supra*, 496 F.2d, at 932, N. 8. And, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) does not eschew this proposition, for there defendant was a federal officer and the sex discrimination acts giving rise to the Complaint were performed in the course of his official duties as a Congressman. 442 U.S. at 236, n. 12, 99 S.Ct. at 2272, n. 12. In these circumstances, plaintiffs' federal constitutional claims aside from those (already rejected) made under 42 U.S.C. Section 1983, cannot stand and they do not fall under the general federal question jurisdictional grant contained in 28 U.S.C. Section 1331.

**C. *The Federal Statutory Claims*:**

**(1) *The Bank Holding Company Act Amendments of 1970.***

■ To anchor the federal question jurisdiction of this Court, plaintiffs also charge

---

11. Indeed, were we to pass judgment on the local Court attachment process we would be acting in an appellate character, much the same way as the local Supreme Court—some-

thing we are not authorized to do as a court of original jurisdiction. See, Judicial Code of the United States, Title 28, United States Code, Chapter 85.

that defendants have violated the provisions of certain federal banking laws, the most prominent of which is the so called 1970 Tie-In Amendments to the Bank Holding Company Act of 1956, Public Law 91–607, 84 Stat. 1760, Sec. 106 (a)–(h), codified at 12 U.S.C. Sections 1971–1978.

The crucial section of this statute allegedly covering Chase's conduct is Section 106(b), codified as 12 U.S.C. Section 1972, which provided, in pertinent part as follows:

"A bank shall not in any manner extend credit, lease or sell property of any kind or furnish any service, or fix or vary the consideration for any of the foregoing on the condition or requirement—

(1) That the customer shall obtain some additional service from such bank *other than a loan, discount, deposit or trust service* ;

(2) . . . . .

(3) . . . . .

(4) . . . . . . .

(5) That a customer shall not obtain some other credit, property, or service from a competitor of such bank . . *other than a condition or* requirement that *such bank shall reasonably impose in a credit transaction to assure the soundness of the credit* . . ." (Emphasis supplied)

Congress defined the term "bank" by making explicit reference to the definition of such term as it appears in Section 2 of the Bank Company Holding Act of 1956, 12 U.S.C. Section 1841(c) [12] which includes

within its scope any bank whether it be state or federally chartered.

The explicit conduct banned by Congress in 12 U.S.C. Section 1972 may give rise to a private treble damage suit in case of business injury caused to a private party by reason thereof. Jurisdiction to entertain such suits is conferred by Congress on federal district courts by 12 U.S.C. Section 1975.[13]

The Bank Holding Company Act 1970 Amendments had a tortuous path through Congress and were the subject of much debate by both the House and the Senate. Since the first bill was introduced in the House during February of 1969, Congressmen debated whether it would be proper at all to append to the measure an anti-tie-in provision outlawing certain conduct the purpose of which was to protect small businessmen from unfair and predatory conduct by banks. When Bill H.R. 6778 was forwarded to the Senate, the anti-tie-in provisions were not included. However, the Senate version did contain certain expansive anti-tie-in provisions which were considerably pruned down in conference prior to final approval by both Houses and inclusion in the final Bill signed by the President on December 31, 1970. 116 Cong.Rec. 41949, 41951–41952, 42426 (1970).

The original anti-tie-in provisions as reported in the original Senate Banking and Currency Committee Report [14] prior to amendment on the Senate floor, contained

---

**12.** 12 U.S. Section 1841(c) provides as follows:

"Bank means any institution organized under the laws of the United States, any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, or the Virgin Islands which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans. Such term does not include any organization operating under Section 25 or Section 25(a) of the Federal Reserve Act, or any organization which does not do business within the United States except as an incident to its activities outside the United States. 'District bank' means any bank organized or operating under the Code of Law for the District of Columbia."

**13.** 12 U.S.C. Section 1975 provides as follows:

"Any person who is injured in his business or his property by reason of anything forbidden in 1972 of this Title may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent, without regard, to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him and the cost of suit including a reasonable attorney's fee.

**14.** The Senate Banking and Currency Committee Report is set out in full at 1970 U.S. Code Congressional and Administrative News, Vol. 3 pp. 5519–5545. The Conference Report also appears there at pp. 5535–5536, and 5579–5580, respectively.

very broad language with respect to the conduct sought to be forbidden. However, at the insistence of Senator Bennet and other members of the Senate Banking and Currency Committee, the original sweeping language was amended to exclude from its reach banking conduct involving transactions such as loans, discounts, deposits or trust services as well as banking practices such as negative covenants requiring debtor not to borrow or engage in other business with competing banks to protect the credit being extended.

Mr. Bennet, as a primary sponsor of the Amendment [15] exempting these banking practices and transactions, explained their exact purpose and limited reach during debate, as follows:

"MR. BENNET. Mr. President, this amendment has been proposed on behalf of myself, the chairman of the committee, the Senator from Alabama (Mr. Sparkman), and the Senators Cranston, Goodell, Packwood, Percy, Stevens, Tower and Williams of New Jersey.

The Amendment which I am proposing is to Section 104 of the bill (12 U.S.C. Section 1972)—the provision containing restrictions on anticompetitive tie-in exclusive dealing arrangements that may arise when banks and bank holding companies offer services functionally related to banking but not part of the traditional bank services.

This amendment, which is based on the committee report, is designed to eliminate from the restrictions of Section 104 traditional banking practices competitive effects and which in many cases are vital to the conduct of sound banking. Under the bill, the Federal Reserve Board would be authorized to grant specific exemptions for those traditional banking practices, since they have no serious anticompetitive effects. However, it seems much better legislative procedure for the Congress not to forbid practices which it wishes to permit, expecting the Federal Reserve Board to take the time, use the energy, and incur the expense of examining everyone of these, and grant exemptions for desirable practices.

The Federal Reserve Board stated in the letter I shall insert that it believes it is better to include exemptions in the statute rather than to place them under administrative discretion. They state, 'Accordingly, we recommend adoption of the amendment.'

Instead, where we are satisfied that a practice is not anticompetitive and should be continued, let us say so in the law, and leave the Board only the task of exempting further activities of the same sort which it may determine to be desirable in the best interest of sound banking practices.

Where the bill might prohibit a bank from extending credit or furnishing a service, or varying the consideration therefor, on condition that the customer obtain some other credit or service from the bank, this amendment would except a loan, discount, deposit, or trust service. This will, among other things, enable the customer to continue to negotiate his costs and fees with the bank on the basis of his entire relationship with the bank, as the committee report points out at page 17. Clearly, neither a bank nor its customer should be attacked under section 104 for taking advantage of the economies and efficiencies of full-service banking.

Where the bill might prohibit a bank from extending credit or furnishing any service, or varying the consideration therefor, on condition that the customer provide some additional credit or service to the bank, this amendment would exempt services related to and usually provided in connection with a loan, discount, deposit, or trust service. This provision will, among other things, make it clear that section 104 is not intended to affect additional correspondent bank relationships, compensating balances, and similar

15. Mr. Bennet more or less followed the supplementary views expressed by him and other members of the Senate Banking and Currency Committee first reporting the bill prior to amendment. 1970 U.S.Code Cong. and Adm. News, Id. at pp. 5546–5549.

practices. If a country bank wishes to obtain investment advice, proof and transit work, or other services from a city bank, and should use its balance at the city bank to pay for these services, there should be no objection to this arrangement, and section 104 should not prohibit this practice.

Where the bill might prohibit a bank from extending credit or furnishing a service, or varying the consideration therefor, on condition that the customer shall not obtain some other credit or service from a competitor, this amendment would exempt such conditions or requirements as the bank shall reasonably impose in a credit transaction to assure the soundness of a credit. Bank loans are usually made on the basis of a careful analysis of the would-be borrower's financial position, including his assets, liabilities, income, expenses, cash flow, etcetera. It is customary, particularly, where a customer is borrowing up to the limit of his ability to pay, to require that during the term of the loan he should not borrow or pledge his assets elsewhere. Such an arrangement is clearly required as a matter of sound banking.

In addition, this amendment would contain a definition of the term 'trust service'—'any service customarily performed by a bank trust department'—and it would change the provision 'on the condition, agreement or understanding' to read 'condition or requirement'. The definition of trust services, like the definition of trust powers in title 12 United States Code section 92a(a) for national banks, is defined in that statute and like the trust powers of national and State banks, it is subject to the scrutiny of the Federal and State supervisory authorities.

The elimination of the words 'condition or understanding' and the substitution of the word 'requirement' are intended to eliminate possible inferences and implications of tie-ins and exclusive dealing arrangements based on a bank's performance of two or more services for a particular customer, or the bank's providing a service to the customer, and receiving a deposit or other service from the customer at the same time. The bill as amended would require that a condition or requirement imposed by the bank must be demonstrated in order to prove that a violation of the section has occurred." 116 Cong.Rec. 32125 (1970).

Underlying the amendment were jurisdictional undercurrents reflected in a Congressional concern that the proposed federal legislation would be impinging upon traditional state authority over the banking process to which federal regulation has always deferred. Thus, after stating that the bank services covered by the prohibitions are really those unrelated to traditional banking (i. e., data processing, insurance, travel agencies and others) Senator Bennet points out to the narrow jurisdictional horizon of the amendment sponsored by him:

" . . . the language of the Committee Bill would apply to all banks, whether or not they are federally chartered, federally insured or federally supervised. To provide federal bank regulatory restrictions on state banking practices without reference to antitrust consideration *would be a reversal of a long-standing policy under which state law regulates state banking practices. . .* When the bill was reported by the Committee, I joined with several other members of the Committee in views which suggested that an amendment was in order to perfect Section 104 (now 12 U.S.C. Section 1972) as reported. *In those views, we suggested that it was important to assure that state banking practices were not brought under the jurisdiction of a federal bank regulatory agency and also that certain normal banking practices should be excluded from the effects of the section.*" 116 Cong.Rec. 32130–31 (1970) (Emphasis supplied)

There are further remarks, in connection with the scope of 12 U.S.C. Section 1972, to the effect that it was not intended to regulate "the internal practices of a bank, that is, the relationship between the bank and its own customers", 116 Cong.Rec. 32127 (1970), for "banking is a highly technical

business. It is very carefully regulated. It was not the purpose of this legislation to change the accepted, tested pattern of the operation of a bank in selling its own services to its customers". 116 Cong.Rec. 32127 (1970).

The wording in 12 U.S.C. Section 1972 follows Senator Bennet's Amendment which is to be judicially construed in accordance with his views. 116 Cong.Rec. 42426 (1970).

Given the restrictive scope of Section 1972 it is only logical to conclude that Section 1975 contains a limited grant of subject matter jurisdiction encompassing only the type of conduct covered by Section 1972. *A fortiori*, it further follows that the statutory exclusions of Section 1972 are not included in the jurisdictional grant of Section 1975.

In light of the foregoing Congressional history and in order for jurisdiction to attach over plaintiffs' Complaint, we must determine then whether the pleadings specifically show or point out to facts constituting a violation of Section 1972 over which this Court could exercise subject matter jurisdiction pursuant to Section 1975.

A careful review of such pleadings indicates that they do not state facts sufficient to fit within the prohibited conduct in Section 1972.

The first 15 or 16 paragraphs of the Complaint contain many ultimate conclusory statements to the effect that Chase imposed certain conditions for extensions of credit to Nesglo which extensions are but loans, part of which is the Factor's Lien Agreement of 1977 referred to therein.[16] But, the factual underpinnings of the conditions or requirements that would enable us to conclude that Chase was departing from traditional banking practices in its dealings with Nesglo are lacking.

Paragraph 6 of the Complaint states that Chase required Nesglo to refrain from doing business with other banks and that it handle its deposits with Chase. However, as we have seen, the legislative history behind Section 1972 shows that it is normal and traditional banking practice for a prospective borrower to keep with the lending bank its business deposits and for the bank to protect its investment by imposing restrictions on borrowing by debtor from other concerns—a legislatively sanctioned form of exclusive dealing which of necessity translates itself into not doing business with other banking or financing entities. Averments that Nesglo refrain from doing business with other banks, when read in conjunction with the multiple loan transactions between Nesglo and Chase, especially as they appear set forth in paragraphs 8, 16 and 17 of the Complaint merely indicate traditional banking conditions or requirements evidencing concern for protection of the soundness of the credit extended. These conditions or requirements are not only legal but customary[17] in the banking industry. In this connection we have seen that Congress felt obliged to pretermit expansive statutory construction by explicitly excepting them from the reach of Section 1972 and hence from the jurisdictional grant of Section 1975.

It is not easy to perceive Chase or any other banking institution granting $2,000,-000 worth of credit to a borrower as plaintiffs aver, without some kind of assurance that the borrower would not continue to borrow unlimitedly from other banks and unilaterally dilute the banking investment made. As previously pointed out, Section 1972 was not intended to interfere with the conduct stemming from traditional banking practices and obviously it "does not prohibit attempts by banks to protect their investments." *Sterling Coal Co. v. United American Bank*, 470 F.Supp. 964, 965 (E.D.Tenn. 1979) and *cases cited*.

---

16. Copy of this document was attached to defendant's Motion to Dismiss of September 18, 1979 as Exhibit "A" thereof.

17. The Commonwealth Factor's Lien statute has a provision tying in on an exclusive basis in favor of the creditor any proceeds from the sale of property covered by a Factor's Lien, under penalty of criminal sanctions to be incurred by the debtor should he use such proceeds for any other purpose. See 10 L.P.R.A. Section 553.

In our view, plaintiffs' allegations do not contain the minimum factual averments necessary to determine whether defendant Chase actually engaged in the conduct complained of. Conclusory statements such as "illegal or outrageous conduct" will not suffice, for the grant by Congress to entertain this type of suit was quite carefully delineated. In these circumstances, and following well-established principles of limited federal court jurisdiction, there is no alternative but to hold that we lack power to adjudicate plaintiffs' claims against defendant based on 12 U.S.C. Section 1972 and 12 U.S.C. Section 1975.[18]

██ With respect to the federal tie-in claims made against natural codefendants Zych and Fernández, it is obvious from the text of the statutory definition of the term "bank" in 12 U.S.C. Section 1841(c), to which Section 1972 remits us, that natural persons are beyond coverage of 12 U.S.C. Sections 1971–1978. We therefore additionally hold that this Court lacks jurisdiction under these federal statutes to entertain the foregoing claims against codefendants Zych and Fernández.

### (2) The Usury Claims

██ Plaintiffs also aver generally that Chase exacted usurious interest from Nesglo on the loan transactions in violation of 12 U.S.C. Sections 85 and 86, which regulate the maximum interest charges that national banking associations may charge, take or receive.

Section 85 provides in pertinent part: "Any association may take, receive, reserve, and charge on any loan and discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the bank is located or in the case of business or agricultural loans in the amount of $25,000 or more at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the bank is located, *whichever may be the greater*, and no more, except that whereby the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter." (Emphasis supplied).

Section 86 in turn prescribes that the "taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section (85), when knowingly done, shall be deemed a forfeiture of the entire interest ..." It also states that should the greater rate of interest have been paid, the person thus paying may recover twice the amount of interest then paid in an action of debt provided such action is commenced within two years from the time the usurious transaction occurred.

The same way that plaintiffs' Complaint is deficient in pleading the requisite facts for this Court to have jurisdiction under 12 U.S.C. Section 1975, said Complaint is also fatally defective to invoke 12 U.S.C. Sections 85 and 86, as federal sources of judicially enforceable rights. The alleged usurious claims, therefore, fail to "arise under" said sections as required by the general federal question statute, 28 U.S.C. Section 1331 invoked by plaintiffs in paragraph 1 of the Complaint.

The alleged usury charges are contained in paragraphs 18 through 21 of the Com-

---

**18.** Defendants also argue in their Motion to Dismiss that plaintiffs' 1972 claims are time barred by virtue of the 4 year time limitation contained in 12 U.S.C. Section 1977, which provides that "any action to enforce any cause of action under this Chapter shall be forever barred unless commenced within four years after the cause of action accrued". An exami-nation of the Complaint discloses that the alleged illegal conditions or requirements occurred during 1972 in the course of the extensions of credit granted by Chase. This obviously renders the Amended Complaint fatally defective, for it has a "built-in" defense. See, generally Wright & Miller, *Federal Practice and Procedure*, Section 1226 (1969).

plaint. The averments set forth therein fail to point out what interest rate was agreed to between Chase and Nesglo, and whether Nesglo, being a corporate entity and the loan being a commercial one in excess of $25,000, Chase exceeded the greater interest limits that from time to time it could have charged, taken, reserved or received pursuant to 12 U.S.C. Section 85. Mere conclusory allegations that illegal interest was exacted and received are obviously insufficient to ascertain whether sections 85 and 86 could have any bearing to plaintiffs' allegations.

The very wording of Section 85 allows national banking associations to charge beyond state usury limitations should federal discount rates on commercial loans and paper be higher than said state limitations. Indeed, it has been held that a national bank may "export" the higher interest rate of the state where located to charge a credit card customer a rate higher than that established by the state where said credit card customer resides. *Marquette Nat. Bank v. First of Omaha Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). The provision is clearly enabling rather than restraining and was intended to place national banks in a position to compete with all other banks in the country. Indeed, Section 85 has been interpreted for over a century so as to give "advantages to national banks over their state competitors". *Tiffany v. National Bank of Missouri*, 18 Wall 409, 413, 21 L.Ed. 862 (1873).

Paragraph 19 contains the curious allegation to the effect that the "illegal exactions have been already admitted by Chase on the excuse that only the interest allowable under the law was meant to be collected..." This allegation seems to place plaintiffs' usurious interest claims beyond the scope and reach of Sections 85 and 86 inasmuch as plaintiffs not only do not plead that the act was done "knowingly" but expressly plead as a "built-in defense" [19] that it was not knowingly done. *Temple Nat. Bank v. Johnson*, 61 Okl., 310, 161 P. 535 (1916); *Schuyler Nat. Bank v. Bollong*, 24 Neb. 821, 40 N.W. 411 (1888); *Garfunkle v. Charleston Bank*, 79 S.C. 404, 60 S.E. 942 (1908).

█ In view of the foregoing, we hold therefore that the conclusory statements advanced by plaintiffs as to exaction of illegal interest in connection with a commercial loan to corporate plaintiff Nesglo [20] do not present cognizable judicial claims necessitating the construction and application of 12 U.S. Sections 85 and 86.

### IV

█ Having come to the conclusion that plaintiffs have failed to properly invoke the jurisdiction of this Court under any relevant federal, constitutional or statutory enactment, and it appearing that there is no complete diversity as between each plaintiff and each defendant on opposing sides of the controversy,[21] we must, of

---

**19.** See note 16, supra.

**20.** As a corporate plaintiff it appears that Nesglo lacks standing to assert a usury claim against Chase as lender by way of the specific usury exception for corporations found in Article 1202 of the General Corporation Law of Puerto Rico, 14 L.P.R.A. Section 2202. To the extent that 12 U.S.C. Section 85 may incorporate Commonwealth Law, it also incorporates this exception. In applying the principle that in usury claims national banks are at the very least to be treated as their state counterparts, this local usury exemption for corporations applies to Chase and undercuts plaintiffs' usury claims under Sections 85 and 86. See: *Monongahela Appliance Co. v. Community Bank and Trust Co., N.A.*, 393 F.Supp. 1226 (D.C.Va. 1975), aff'd, 532 F.2d 751 (4th Cir. 1976).

**21.** To vest the federal district court with jurisdiction on the ground of diversity of citizenship, diversity must affirmatively appear and must be complete as between plaintiffs on the one hand and the defendants upon the other. *Oppenheim v. Sterling*, 368 F.2d 516 (C.A.Colo. 1966), certiorari denied, 386 U.S. 1011, 87 S.Ct. 1357, 18 L.Ed.2d 441, rehearing denied, 388 U.S. 925, 87 S.Ct. 2127, 18 L.Ed.2d 1380, rehearing denied 389 U.S. 1059, 88 S.Ct. 757, 19 L.Ed.2d 861. Cf. *Schultz v. Cally*, 528 F.2d 470 (C.A. 3d 1975); *Basso v. Utah Power & Light Co.*, 495 F.2d 906 (C.A. 10th 1974). In the instant case, plaintiffs have failed to plead diversity jurisdiction, and, therefore, this Court simply cannot entertain this action on that ground.

necessity, dismiss this action for lack of jurisdiction.[22] *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806); *Susquehanna & W.V.R. Coal Co. v. Blatchford*, 11 Wall 172, 20 L.Ed. 179 (1871).

ty of Cook, A Body Politic and Corporate, Defendants.

**No. 77 C 341.**

United States District Court,
N. D. Illinois, E. D.

Dec. 5, 1980.

**22.** We have not discussed nor feel it necessary to discuss plaintiffs' invocation of the Declaratory Judgment Provisions contained in the Judicial Code, 28 U.S.C. Sections 2201–2202, for it is now well settled that these sections are not independent sources of subject matter jurisdiction, which must always appear from the well-pleaded factual allegations of the Complaint regardless of whether the latter only seeks a declaration of rights. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950).